Bill DEMITROPOULOS, on behalf of
himself and all others similarly
situated, Plaintiff,

v.

BANK ONE MILWAUKEE, N.A.; and
Team Chevrolet, Inc., doing business
as Team Chevrolet Geo, Defendants.

No. 95 C 1753.

United States District Court,
N.D. Illinois,
Eastern Division.

Jan. 17, 1997.

Daniel A. Edelman, James O. Latturner, Cathleen Combs Cohen, Tara Leigh Goodwin, Michelle Ann Weinberg, Rick D. Young, Edelman & Combs, Chicago, IL, James Eric Vander Arend, Gessler, Hughes & Socol, Ltd., Chicago, IL, O. Randolph Bragg, Chicago, IL, for Bill Demitropoulos.

Richard F. Zehnle, Diane Marie Kehl, Christine A. Provost, Vedder, Price, Kaufman & Kammholz, Chicago, IL, for Bank One Milwaukee, N.A.

Gary Feiereisel, Terrence Franklin Guolee, Steven R. Johnson, Frank Kasbohm, Fraterrigo, Beranek, Feiereisel & Kasbohm, Chicago, IL, for Team Chevrolet Inc.

## MEMORANDUM OPINION AND ORDER

CASTILLO, District Judge.

Plaintiff Bill Demitropoulos and his fellow class members claim that defendant Bank One owes them interest on security deposits paid under the Bank's standard automobile lease agreement. In a nutshell, Demitropoulos contends that Article 9 of the Uniform Commercial Code requires the Bank to pay to him the fruits of the deposit, such as interest or profits from its use, at the lease's end. Because the Bank failed to pass along this bounty, he claims, it violated the UCC.

Count I of the amended complaint is directed to both defendants and alleges that the standard automobile lease form violates the disclosure requirements set forth in the Consumer Leasing Act, 15 U.S.C. § 1667 et seq.[1] The remaining counts are directed solely to Bank One. Count II of the amended complaint seeks restitution of the interest allegedly earned by the Bank. Count III claims that the Bank's failure to disclose its retention of the interest constitutes an unfair or deceptive act under the Wisconsin Consumer Fraud Act, Wis. Stat. § 100.18.

Early last year, this Court issued two published opinions on motions to dismiss this class action suit alleging numerous violations of federal and state consumer law. In the most recent opinion, we denied Bank One's motion to dismiss Counts II and III, holding that Wisconsin's Uniform Commercial Code applies and requires the Bank to remit to the class members any interest it may have earned on the car lease deposits. *See Demitropoulos v. Bank One Milwaukee, N.A. (Demitropoulos II)*, 924 F.Supp. 894, 897 (N.D.Ill.1996). Armed with a factual record, Bank One now moves for summary judgment

---

1. These claims are not at issue here, except as they relate to the Bank's alleged failure to disclose its policy of retaining interest on security deposits.

on the very same issue. The Bank argues that because the deposits did not in fact earn interest, none is owed to Demitropoulos. Submitting a brief as amicus curiae, the American Financial Services Association goes one step farther, claiming that the UCC is not even applicable to the security deposits. After careful consideration, we decline to reverse our previous holding that the UCC applies and commands that any interest earned on the security deposit be paid to Demitropoulos. Nevertheless, we grant Bank One summary judgment on Counts II and III because the deposits did not produce interest cognizable under the UCC.

## RELEVANT FACTS [2]

In December 1994, Demitropoulos signed Bank One's standard automobile lease form covering the lease of a 1994 Chevy Corvette.[3] Def's Facts ¶ 3. As required by the lease, he paid a $550 refundable security deposit to Team Chevy. *Id.* ¶ 6; Consumer Closed End Vehicle Lease Agreement ("Lease") ¶ 4.b. (attached to Pl's Resp. as Ex. C). The deposit was not to be used as the final lease payment. Pl's Add'l Facts ¶ 3. It was available to adjust Demitropoulos' liability in case of the lease's early termination. Lease ¶ 13.b.

Team Chevy sold the Corvette to Bank One for financing purposes, subtracting $550 from the purchase price to reflect the fact that Demitropoulos had already paid Chevy the security deposit. Def's Facts ¶ 6. In turn, Bank One entered a debit on its general ledger in the amount of the deposit, recognizing that it would have to return the $550 to Demitropoulos at the end of the lease.[4] Aff. Kurt Swiecichowski ¶ 3. When the lease terminated, Bank One returned the security deposit to Demitropoulos, without interest. Def's Facts ¶ 9.

The key factual dispute centers on what happened to the class members' security deposits in Bank One's possession. The parties agree that the Bank kept track of all its car lease deposits by entering them in a "Monthly Transaction Journal," which is simply a daily record of the Bank's funds from these deposits. Pl's Add'l Ex. They further concur that Bank One did not put the deposits in interest-bearing accounts.[5] Def's Facts ¶ 6; Pl's Resp. ¶ 6. From there, the parties diverge based on dueling affidavits.

2. The facts are drawn from the parties' statements of material facts and supporting exhibits. Under Rule 12(M)(3) of the Local General Rules of the United States District Court for the Northern District of Illinois, Bank One filed a statement of material facts as to which it contends there is no genuine dispute. This statement is referred to as "Def's Facts ¶ ___." Demitropoulos filed a response to Bank One's statement (cited as "Pl's Resp. ¶ ___") under Local Rule 12(N)(3)(a), designating the facts to which it claims the parties disagree. Demitropoulos also filed a statement of additional facts (cited as "Pl's Add'l Facts ¶ ___"), as permitted by Local Rule 12(N)(3)(b).

The Rule 12(M) and 12(N) statements are subject to the following constraints. The statements must contain "specific references to affidavits, parts of the record, and other supporting materials . . . ." Local Rule 12(M)(3). All properly supported material facts are deemed admitted unless properly controverted by the responsive statement of the opposing party. Local Rule 12(M) and 12(N)(3)(b); *see also Flaherty v. Gas Research Inst.*, 31 F.3d 451, 453 (7th Cir.1994); *Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 921–22 (7th Cir.1994). The mere denial of a particular fact without "specific references to affidavits, parts of the record, and other supporting materials" that establish a factual dispute is insufficient—where met with such a naked denial a factual assertion may be deemed admitted. *Flaherty*, 31 F.3d at 453.

3. The same form lease was signed by all the class members. For ease of exposition, we often use "Demitropoulos" to refer to the entire class.

4. Demitropoulos attacks this statement, contained in the affidavit of Bank One's Vice President in charge of reporting and financial analysis for the Regional Consumer Loan Center, because "no supporting documentation of the general ledger entry" corroborates it. This Court reminds Demitropoulos that the affidavit is sworn testimony, which needs no documentary confirmation in order to be treated as evidence.

5. Section 3 of the Illinois Consumer Deposit Security Act of 1987, 815 ILCS 165/3 (1988) permits a lessor requiring lessees to pay deposits under consumer leases either to file a $10,000 surety bond with the Illinois Attorney General in favor of the State of Illinois for the benefit of the lessees, or to place the deposit in a bank account. If the account bears interest (and it need not), the interest goes to the lessee at the end of the lease. Instead of putting the security deposits in a bank account, Bank One filed a surety bond with the Attorney General. Def's Facts ¶ 7.

Plaintiff's expert, John Walsh, who serves as Vice President of a major Chicago bank, offers his opinion on how Bank One probably managed the car lease security deposits. Aff. John Walsh ¶ 2. Pointing out that the affidavit of Bank One's Vice President does not say that the deposit funds were restricted, Walsh states that, "assuming a well-managed banking institution, those funds would have been put to use to either lower the amount of the bank's borrowings or fund the bank's assets." *Id.* ¶ 6. He elaborates:

> By using the funds, the bank would likely have lowered its interest expense or increased its interest income. To not invest available unrestricted funds when the opportunity is present, would not be maximizing shareholder earnings and would likely bring criticism from shareholders and from bank regulators.

*Id.* Walsh explains that when a bank is short on funds late in the day, it borrows what it needs to manage its daily cash position, often from other banks' excess funds held in balances at the Federal Reserve. *Id.* But a bank operating at a surplus from security deposit funds can rely on them instead of borrowing money, and may even lend money to other banks. *Id.* The result is that the bank effectively earns interest on the security deposits, either relieved of the need to borrow from the Federal Reserve or able to collect interest by lending to other banks. *Id.* Walsh concludes that a "reasonable proxy" for the benefit from the deposits is the average Fed Funds Sold rate or the average interest rate accumulated on earning assets, both calculable from the Bank's quarterly or annual reports. *Id.*

Bank One admits that the class members' car lease security deposits increased the Bank's operating funds. Def. Mot. S.J. at 10. According to Bank One's Vice President, these funds fluctuated daily, as did the Fed's borrowing rate. Aff. Kurt Swiecichowski ¶ 4. He states that the Bank did not rely on increased operating funds to manage its cash position every day during the class period. *Id.* ¶ 5.

What appears to be a factual dispute about whether the deposits earned money is really a legal battle over whether Bank One received interest from the security deposits in a manner contemplated by Article 9 of the UCC. Thus, it is appropriate for summary judgment consideration.

## LEGAL STANDARDS

Summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). To withstand a motion for summary judgment, the non-movant must "make a showing sufficient to establish the existence of [the] element[s] essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

In considering a motion for summary judgment, the court views all evidence in the light most favorable to the non-moving party and draws all inferences in that party's favor. *Schmidt v. Methodist Hosp.,* 89 F.3d 342, 344 (7th Cir.1996). Summary judgment may be granted if the evidence is merely colorable, or is not significantly probative, *Anderson,* 477 U.S. at 249–50, 106 S.Ct. at 2510–11, or merely raises "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). If "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine' issue for trial." *Id.* at 587, 106 S.Ct. at 1356. In making its decision, the court's sole function is to determine whether sufficient evidence exists to support a verdict in the non-movant's favor. *Anderson,* 477 U.S. at 255, 106 S.Ct. at 2513–14.

## ANALYSIS

Before we address the substance of the parties' (and amicus') arguments, we dispose of a preliminary matter—the validity of the lease form's choice of law provision. We then revisit the UCC's applicability to Demitropoulos' security deposit, interpret the Code's provision governing money received

from collateral, and, finally, apply the Code to the claims before us.

### A. *Wisconsin Law Applies*

■ We are initially confronted with a choice of law issue that we had considered settled by our earlier opinions. Contained in Bank One's automobile lease is a clause providing that Wisconsin law will govern the parties' disputes. In briefing its first motion to dismiss, Bank One vigorously argued in favor of upholding that clause and applying Wisconsin law. Demitropoulos, an Illinois resident, urged the Court to invalidate the choice of law provision and apply Illinois law instead. We enforced the clause, using Wisconsin law to analyze Demitropoulos' state consumer law claims, including those seeking interest on the security deposits. *Demitropoulos v. Bank One Milwaukee, N.A. (Demitropoulos I)*, 915 F.Supp. 1399, 1413–14 (N.D.Ill.1996); *Demitropoulos II*, 924 F.Supp. at 896–97.

Contrary to its earlier stance, Bank One now asks the Court to void this provision, contending that the UCC forbids enforcing the parties' chosen law.[6] The Bank relies on Article 2A, the UCC's chapter governing leases, which limits the power of parties to a consumer lease[7] to choose the law regulating their disputes. Section 2A–106, enacted in both Wisconsin and Illinois,[8] provides:

> (1) If the law chosen by the parties to a consumer lease is that of a jurisdiction other than a jurisdiction in which the lessee resides when the lease agreement becomes enforceable or within 30 days thereafter or in which the goods are to be used, the choice is not enforceable.

Bank One points out that the parties have chosen the law of a state "other than a jurisdiction in which the lessee resides" because Demitropoulos and the class members live in Illinois, not Wisconsin. Thus, according to Bank One, the choice of law is unenforceable. This, interestingly, leaves the Bank free to argue the application of Illinois' Consumer Deposit Security Act of 1987, 815 ILCS 165/3, whose provisions purportedly preempt the UCC's more stringent dictates concerning interest payments on security deposits. In other words, because Illinois law suits Bank One's objectives on this issue, it asks the Court to ignore the parties' contract to be governed by Wisconsin law.

■ We decline to overturn our previous choice of law ruling or to apply Illinois law piecemeal to Demitropoulos' security deposit claims. A number of factors weigh against using § 2A–106 to void the parties' chosen law. First, this Code provision was enacted to protect consumer-lessees, not Bank-lessors: § 2A–106's comment warns of the "real danger that a lessor may induce a consumer lessee to agree that the applicable law will be a jurisdiction that has little effective consumer protection." Demitropoulos, the consumer, does not object to the application of Wisconsin law—the party opposing it is the Bank. This Court will not apply a statute to subvert the very reasons for its enactment. Second, Bank One is judicially estopped from taking a position diametrically opposed to its stance position favoring the choice of law provision. Judicial estoppel prevents a party from taking clearly inconsistent legal positions at different stages of litigation in order to take unfair advantage "in a forum designed for suitors seeking justice." *In re Cassidy*, 892 F.2d 637, 641 (7th Cir.1990); *see Continental Illinois Corp. v. Commissioner of Internal Revenue*, 998 F.2d 513, 518 (7th Cir.1993); *Cassidy*, 892 F.2d at 641–42. Just because Bank One's interests have changed does not mean that the law must mold itself accordingly.

Ultimately, however, whether UCC § 2A–106 voids the parties' choice of law clause is a

---

**6.** For purposes of this discussion, we assume that the UCC applies. Later in the opinion we demonstrate that this assumption is correct.

**7.** A "Consumer Lease" is one entered into by a lessor regularly engaged in the business of leasing or selling and a lessee who is leasing primarily for a personal, family, or household purpose, and whose total payments do not exceed $25,-000. Uniform Commercial Code § 2A–103(e).

Demitropoulos' complaint acknowledges that "many" of the class members leased cars from Bank One for personal, family, or household purposes, and that "in many cases," the total contractual obligation was less than $25,000. Am. Compl. ¶ 4.

**8.** Wis. Stat. § 411.106(1); 810 ILCS 5/2A–106.

non-issue because the end result in this case is the same under either Illinois or Wisconsin law. Both states have enacted the relevant portions of the Uniform Commercial Code in identical language. And even if the Illinois Consumer Deposit Security Act operates to alleviate the Illinois UCC's burden on lessors to pay interest on security deposits, this interaction has no legal significance. Bank One is entitled to summary judgment even under the UCC's more demanding interest payment provisions. Consequently, consistent with our prior opinions, we consult Wisconsin law to resolve the questions before us.

### B. *The Security Deposits Create a Security Interest Under Wisconsin's Uniform Commercial Code*

In *Demitropoulos II*, we held that Wisconsin's Uniform Commercial Code applies to Demitropoulos' claim for interest on his security deposit. 924 F.Supp. at 896–97. Briefly recapped, our reasoning proceeded along the following lines: Article 9 of Wisconsin's UCC covers "any transaction (regardless of form) which is intended to create a security interest in personal property." Wis. Stat. § 409.102(1)(a). This includes security interests created by a contract (i.e., a lease), such as pledges. *Id.* § 409.102(2). The question before us was whether Bank One's lease form created a security interest in the class members' cash deposits. Undertaking a definitional analysis, we determined that it did. The UCC defines a security interest as "an interest in personal property . . . that secures payment or performance of an obligation." *Id.* § 401.201(37)(a). Personal property includes money. *Id.* § 990.01(27). And we found it reasonable to draw the inference that the deposit was designed to secure Demitropoulos' obligations under the lease. 924 F.Supp. at 896–97. Although sparse, case law in this area harmonized with our holding that Bank One had an Article 9 security interest in Demitropoulos' $550 cash deposit. *See Werbosky v. Ford Motor Credit Co.*, 1996 WL 76133, at *1 (S.D.N.Y. Feb. 22, 1996).

Nevertheless, the American Financial Services Association, writing as amicus curiae, contends that our conclusion was off-base.

Its brief dwells on a single point: a security deposit paid to a lessor under a personal property lease is not a pledge of money, subject to Article 9. Rather, it creates a debt that the lessor owes the lessee. Such debts are outside the scope of Article 9. Moreover, the AFSA maintains, under "established common law rules" the lessor is not obligated to pay interest on this debt. As a final measure, the AFSA attacks the *Werbosky* case as wrongly decided, urging us to eschew reliance on it because the decision would "change settled law upsetting commercial expectations to no ultimate benefit." AFSA Br. at 13. We address these arguments in turn after expanding on our conclusion that the UCC applies to Demitropoulos' security deposit.

#### 1. *The Code's interpretive and definitional sections encompass the security deposits in this case*

As an initial matter, we point out that Code's own provisions on interpretation call for the UCC to be "liberally construed." Wis. Stat. § 401.102(1). As judges, we must heed this directive. See RAY D. HENSON, SECURED TRANSACTIONS UNDER THE UNIFORM COMMERCIAL CODE § 2–2, pp. 10–11 (2d ed. 1979) ("This command from the enacting legislature is entitled to complete acceptance, recognition and enforcement by every court. . . . Is there any reason why the Code should not 'be liberally construed and applied to promote its underlying purposes and policies'? There is none. If the legislature commands, the courts must obey."). Consistent with this philosophy, Article 9 itself has a "very broad reach," generally covering any consensual security interest in personal property unless explicitly excluded by § 9–104. BARKLEY CLARK, THE LAW OF SECURED TRANSACTIONS UNDER THE UNIFORM COMMERCIAL CODE ¶ 1.03, at 1–13 (rev. ed.1993); see Wis. Stat. § 409.102(1)(a) & comment 5. Commentators have characterized Article 9's grasp as "octopus"-like and have marveled at its "sweeping breadth." CLARK, ¶ 1.03, at 1–13; 4 JAMES J. WHITE & ROBERT S. SUMMERS, UNIFORM COMMERCIAL CODE § 30–2, at 6 (4th ed.1995). With these standards in mind, we approach the Code's substantive provisions.

Article 9 applies to "security interests created by contract." Wis. Stat. § 409.102. The term "security interest" is defined expansively, as "any interest in personal property or fixtures which secures payment or performance of an obligation." Wis. Stat. § 401.201(37). Demitropoulos' security deposit is a creature of contract, Bank One's standard automobile lease form. And the Wisconsin legislature includes cash within the definition of personal property.[9] *See* Wis. Stat. § 990.01(27). The issue is therefore whether the deposit was given to secure payment or performance of an obligation. To that end, we know that the deposit was not to be used as the final lease payment. Pl's Add'l Facts ¶ 3. It was, however, available to adjust Demitropoulos' liability in case of the lease's early termination, that is, to secure his obligation not to end the lease early. *See* Lease ¶ 13.b. ("The charges for early termination will be as follows: ... Your liability under the Lease will be adjusted for any excess mileage charges ..., damages to the Vehicle or other charges provided for in this Lease, and your security deposit."). Bank One has not cited any facts demonstrating that the deposit was not designed to secure an obligation, and, in the absence of contrary evidence, we must take the plaintiff's facts as true. *Flaherty v. Gas Research Inst.*, 31 F.3d 451, 453 (7th Cir.1994). Consequently, based on Article 9's required liberal construction, the broad definition of security interest, the provisions of the lease, and the absence of any facts that would remove this transaction from Article 9, we reaffirm our finding that the lease creates a security interest in Demitropoulos' deposit.[10]

While scarce, the case law confronting this question supports us. In *Werbosky v. Ford Motor Credit Co.*, the court held that a security deposit paid under an automobile lease created a security interest subject to Article 9's interest payment provisions. 1996 WL 76133, at *1 (S.D.N.Y.1996). Likewise, an equipment lessor was found to have an Article 9 security interest in a cash deposit the lessee paid to secure its performance. *In re Atlanta Times, Inc.*, 259 F.Supp. 820, 827 (N.D.Ga.1966), *aff'd sub nom. Sanders v. National Acceptance Co.*, 383 F.2d 606 (5th Cir.1967). And a judge evaluating a security deposit paid to utility company as a condition of uninterrupted electrical service found that the deposit created a security interest under Article 9. *In re Barr*, 180 B.R. 156, 160 (Bankr.N.D.Tex.1995) (relying on *Atlanta Times* as persuasive authority).

### 2. The common-law rule employed in real Property cases is inapplicable to a lease for Personal Property

The AFSA's primary argument against finding that Bank One took a security interest in Demitropoulos' security deposit is that "most commentators and courts" hold that real property (as opposed to personal property) lease security deposits create a debt, which is outside the reach of the UCC, not a pledge, which Article 9 explicitly embraces. Liberated from the confines of the UCC, the landlord-debtor is spared the burden of paying interest on the tenant's deposit. This "common-law rule," the AFSA contends, is equally germane to security deposits paid under a lease for personal property. According to the AFSA, all security deposits involve contract rights, regardless of whether the underlying lease is for personal or real property. Because courts do not apply the UCC to these contract rights when the lease involves real property, there is no reason to hold differently when the lease covers personal property.

The AFSA is comparing apples to oranges. Any common-law precepts applied to security deposits paid under real property leases are irrelevant because real property transactions

---

9. It is important to note that the operative question is whether the lease creates a security interest in Demitropoulos' cash security deposit, not in the car being leased. The latter issue is not relevant here, and involves an entirely different Article 9 analysis.

10. The Wisconsin Statutes already assume this conclusion. Section 422.417(2), part of the Wis-

consin Consumer Act and entitled "Restrictions on security deposits," states that "[t]his section does not prohibit a security interest in a cash security deposit for a consumer lease of motor vehicles or agricultural equipment." Although Illinois does not have a similar provision, given our Article 9 analysis the result is the same under Illinois' UCC alone.

are specifically carved out of Article 9. Section 9–104 spells out in detail what is excluded from the Article's scope. One of the excluded transactions is "the creation or transfer of an interest in or lien on real estate, including a lease or rents thereunder." U.C.C. § 9–104(j) (codified at . Wis. Stat. § 409.104(10)). The landlord-tenant cases [11] that the AFSA relies on for the "common-law rule" that security deposits do not create Article 9 security interests are therefore inapposite—real property lease deposits are encompassed by § 9–104(j)'s exclusion, while the automobile lease deposit in this case is not.

Although there are no Wisconsin decisions on point, the UCC case law in other jurisdictions explains the crucial distinction between money paid as security under real versus personal property leases. In holding that real property leases and rents are expressly excluded from the UCC, the following cases underscore the point that the UCC was meant to cover only claims under personal property leases. For example, *In re Kavolchyck*, 154 B.R. 793 (Bankr.S.D.Fla.1993), *aff'd*, 164 B.R. 1018 (S.D.Fla.1994), faced the question whether a couple who was assigned rents under a real estate lease had to comply with Article 9's filing requirements to perfect their interest in the rents. Finding the rents outside the scope of Article 9, the court held that "Article 9 of the UCC does not cover the perfection of security interests in real property leases or rents derived therefrom." *Id.* at 797. Characterizing the assignees' right to rents as a "contract right" or as "personal property" did not alter the equation. *Id.* While contract rights and personal property are normally encompassed by Article 9, in this case the rents also constituted "interests in real estate" excluded by § 9–104(j). *Id.* at 797, 799. This exclusion overrode any of the UCC's inclusive provisions.

Likewise, *In re Standard Conveyor Co.*, 773 F.2d 198, 204 (8th Cir.1985), held that money deposited in an escrow account to secure the bankrupt real estate lessee's performance fell outside the scope of Article 9. The court was asked to determine which of two creditors had priority to the money in the escrow account. As part of this process, the court found that "[a]n Article 9 security interest in the underlying proceeds of a real estate lease—rents—is expressly precluded by U.C.C. § 9–104(j)." *Id.* Other courts concur. *See, e.g., In re Patterson*, 64 B.R. 189, 191–92 (Bankr.N.D.Ill.1986) (money in escrow account designed to serve as advance rental and/or liquidated damages account were "rents from the lease of real estate" excluded from Article 9's coverage).

Finally, *In re Bristol Assocs. Inc.*, 505 F.2d 1056 (3d Cir.1974), the leading decision interpreting UCC § 9–104(j), held that rents under a real estate lease are excluded from Article 9 as "transactions touch[ing] realty." *Id.* at 1060. The landlord in that case assigned to a bank his interest in a real estate lease as collateral for a loan. When the landlord filed for bankruptcy, the bank and the receiver vied for priority in the rents. The receiver argued that because Article 9 expressly covers security interests in personal property and state law classified real estate leases as personal property, the § 9–104(j) exclusion did not apply. *Id.* at 1059–60. Rejecting the receiver's argument, the court found that regardless of whether the lease and its rents constituted personal prop-

---

11. The cases the AFSA cites for the common-law rule that security deposits create debts that fall outside the UCC and trigger no duty to pay interest all involve leases for real property. *See, e.g., Korens v. R.W. Zukin Corp.*, 212 Cal.App.3d 1054, 261 Cal.Rptr. 137 (1989) (tenants suing landlord to recover interest on security deposits); *Levinson v. Shapiro*, 238 A.D. 158, 263 N.Y.S. 585 (pre-UCC tenant's action against landlord for converting the security deposit), aff'd, 263 N.Y. 91, 188 N.E. 265 (1933); *Matter of State of New York v. Parkchester Apts.*, 61 Misc.2d 1020, 307 N.Y.S.2d 741 (Sup.Ct.1970) (attorney general seeking order requiring landlords to put de-

posits in interest-bearing accounts and remit interest to tenants); *Donnelly v. Rosoff*, 164 Misc. 384, 298 N.Y.S. 946 (Mun.Ct.1937) (pre-UCC suit to recover security deposit paid under real estate lease); *Goodman v. Schached*, 144 Misc. 905, 260 N.Y.S. 883 (Nassau Cty. Ct.1932) (pre-UCC case in which tenant defended against dispossession with a claim for security deposit conversion); *Handle v. Real Estate–Land Title & Trust Co.*, 316 Pa. 116, 173 A. 313 (1934) (pre-UCC case in which landlord sued bank to recover tenant's security deposit). As is evident, many of these cases pre-date the UCC's enactment in the 1960s, and thus cannot be used to discern its scope.

erty, their transfer was nevertheless specifically excluded by § 9–104(j).[12]

These cases defeat the AFSA's argument that common-law rules excepting real estate leases from Article 9 must be extended to personal property leases. First, the decisions hold that "rents" paid under a real estate lease fall outside the scope of Article 9 by virtue of § 9–104(j), not "common-law rules." Whether the rents take the form of an escrow account, as in *Standard and Patterson*, or a tenant's security deposit, as in the AFSA's landlord-tenant cases, the money is paid to secure obligations under a real estate lease. In contrast, Demitropoulos' security deposit was paid under a personal property lease, which § 9–104(j) does not eliminate from Article 9. Second, AFSA's attempts to unify personal and real property leases by identifying them both as contract rights or personal property fails. *Kavolchyck* and *Bristol* render such labels irrelevant. Those cases provide that § 9–104(j) scrutinizes the transaction more closely— even if rents or deposits are themselves contract rights or personal property, their connection with real estate precludes Article 9's application.

■ The conclusion we draw from the preceding analysis is that money paid under real property leases is distinguishable from money paid pursuant to a personal property lease. These transactions are not both subject to common-law rules; rather, real estate lease deposits are specifically carved out of Article 9 by statute, while personal property lease deposits remain squarely within the Article's scope.

The AFSA's authority is not to the contrary. The two cases cited as extending the "common-law rule" to personal property leases do nothing of the sort. For example, the AFSA quotes a portion of *Mallory Assocs. v. Barving Realty Co.*, 300 N.Y. 297, 90 N.E.2d 468 (1949), another landlord-tenant dispute over a real estate lease deposit. But *Mallory* merely addressed the applicability of New York's real property law, not the scope of the UCC. In fact, *Mallory* was decided long before the UCC's enactment, and therefore bears not at all on the Code's breadth. Moreover, the decision could not have extended any common-law principle to personal property leases because the only lease before the court involved real estate. The AFSA's second case, *United States v. Samel Refining Corp.*, 461 F.2d 941 (3d Cir.1972), is equally unavailing. The quoted portion, which again examined a security deposit paid under a real, not a personal, property lease, says nothing about the UCC.[13] The court merely

---

**12.** *Bristol* addressed another issue that is only marginally relevant to the facts before us. Commentators have recognized that § 9–104(j)'s exclusion of interests in real estate or rents thereunder is at odds to some extent with one of the chapter's scope provisions, § 9–102(3). *See* CLARK, ¶ 1.08[10][b], at 1–139; 4 WHITE & SUMMERS, § 30–7, at 46. This section states:

(3) The application of this chapter to a security interest in a secured obligation is not affected by the fact that the obligation is itself secured by a transaction or interest to which this chapter does not apply.

The question arises whether this section pulls rents under a real estate lease back into Article 9. *Bristol*, 505 F.2d at 1059. The official comment (which appears in Wisconsin's UCC) clears things up:

Comment 4: An illustration of subsection (3) is as follows: The owner of Blackacre borrows $10,000 from his neighbor, and secures his note by a mortgage on Blackacre. This Article is not applicable to the creation of the real estate mortgage. Nor is it applicable to a sale of the note by the mortgagee, even though the mortgage continues to secure the note. However, when the mortgagee pledges the note to secure his own obligation to X, this Article applies to the security interest thus created, which is a security interest in an instrument even though the instrument is secured by a real estate mortgage.

U.C.C. § 102(3) comment 4, *quoted in Bristol*, 505 F.2d at 1058–59. The court resolved the tension between the two provisions as applied to real estate rents and leases by explaining that the comment "makes explicit that the promissory note itself falls within the scope of Article 9 by virtue of its status as an instrument." *Id.* at 1061. Because "a lease of real property is clearly not an instrument," it could not be analogized to the promissory note example cited in the comment. The court determined that the comment "refute[s] the possibility that Article 9 reaches out to encompass every transaction colorably included under section 9–102." *Id.* Similarly, we find that the security deposits paid under real estate leases, such as those in the AFSA's cited cases, remain outside Article 9 because they cannot be classified as instruments.

**13.** In its reply brief, the AFSA concedes that the *Samel* court was dealing with a real property lease, but contends that "[d]espite the fact that

stated that "the relationship of a tenant to the landlord with respect to a security deposit is that of creditor and debtor." *Id.* at 943. As explained earlier, how a court characterizes a real estate lease deposit is irrelevant—the UCC views real and personal property lease deposits as different animals.

### 3. Even the common law would subject Demitropoulos' security deposit to the UCC

■ Even if we assumed that common-law rules distinguishing debts from pledges were applicable here, it would not change our conclusion that Article 9 applies to this case. To begin with, courts are split on whether real estate lease deposits are debts or pledges. 2 MILTON R. FRIEDMAN, FRIEDMAN ON LEASES § 20.4, at 1166–67 (3d prtg.1990); Comment, *Interest on Security Deposits—Benefit or Burden to Tenant?*, 26 U.C.L.A. L.Rev. 396, 399–400 (1978). The primary difference between debts and pledges is that the landlord classified as a debtor has great discretion to manage the security deposit as he wishes, forcing the tenant to "rely heavily on the

landlord's honesty for return of the deposit." *Id.* at 400. While the landlord in a pledgor-pledgee relationship may still commingle the deposit with his own funds, he is prohibited from "permanently disposing of the deposit or in any way jeopardizing the possibility of its eventual return to the tenant." *Id.* at 400–01.

Turning to the facts before us, Demitropoulos' deposit arrangement with Bank One resembles a pledge much more than a debt. First, the lease provides that the deposit is refundable. Demitropoulos need not simply rely on Bank One's charity for its return. In addition, the lease's early termination provisions lay out the specific circumstances in which the Bank is permitted to deplete the deposit. Its consumption is therefore not left to the whims of the Bank. Consequently, we find the AFSA's characterization of the deposit as a debt to be misguided. Even the common law would confer upon the deposit pledge status, bringing it within the UCC. See Wis. Stat. § 409.102(2) ("This chapter applies to security interests created by contract including pledge....").[14]

real property was involved, the Third Circuit still used Article 9 to analyze the nature of a security deposit." AFSA Reply at 5. We find that characterization misleading. *Samel* never discussed whether the real estate lease deposit created an Article 9 security interest or triggered the UCC's interest payment provisions. Rather, the issue was the coverage of a private security agreement. The agreement was between the tenant, Samel, and a third party, his creditor. It granted the creditor a security interest in all Samel's "contract rights," a term defined by reference to the UCC. 461 F.2d at 942. The court found that Samel's right to the return of his security deposit was a "contract right" in which the creditor had an interest by virtue of the parties' agreement. *Id.* at 943. Notably, this finding prompted a dissent challenging the majority's characterization of the right to a security deposit as a "contract right." *Id.* (Kalodner, J., dissenting). Moreover, *In re Kavolchyck*, 154 B.R. 793, 797, 799 (Bankr.S.D.Fla.1993), explained that classifying something as a "contract right" is not enough to overcome § 9–104(j)'s exclusion of real estate transactions.

14. The AFSA's remaining arguments merit only footnote discussion. As a corollary of its contention that Demitropoulos' security deposit creates a debt, AFSA maintains that Bank One had the right to set off its debt against any missed payments. The UCC excludes from Article 9 "any right of setoff." Wis. Stat. § 409.104(9). But Bank One's contractual right to use the deposit

to satisfy Demitropoulos' liability under the lease is not a right of set-off. Section 409.104(9) refers instead to a bank's common-law right, in every jurisdiction, to freeze a demand or time account and use the deposit funds to offset an unpaid loan. CLARK, ¶ 1.08[9], at 1–122. This situation differs from our facts for two reasons. First, Article 9's drafters excluded the right of set-off because it arises by operation of law rather than by consent—Article 9 covers only consensual arrangements. CLARK, ¶ 1.08[9][c][iii], at 1–27 (Supp. II 1996); HENSON, § 3–2, p. 21. In contrast, any right Bank One has to adjust Demitropoulos' liability using his deposit is consensual, conferred by the car lease. Second, the deposit account against which a bank exercises a right of set-off must be the property of the depositor, deposited without restriction. CLARK, ¶ 1.08[9][c][v], at 1–28. But Demitropoulos' $550 was deposited with a substantial restriction—he had no access to it until the end of the lease. For these reasons, § 409.104(9)'s right of set-off exclusion is inapplicable here.

Finally, the AFSA urges that following *Werbosky v. Ford Motor Credit Co.'s* holding applying the UCC to automobile lease security deposits would "change settled law upsetting commercial expectations to no ultimate benefit." AFSA Br. at 13. This argument can be dismissed summarily. All the AFSA's professed concerns are over the state of real property law. But any common-law rules applied to real estate leases

Having found that Wisconsin's Commercial Code applies to Demitropoulos' security deposit, we move on to examine what the Code says about paying interest on security deposits.

### C. The UCC Requires Payment of Interest on Security Deposits Only if Any is Actually Earned

In *Demitropoulos I*, we held that because Bank One's lease form created a security interest in the cash deposits under Wisconsin's Uniform Commercial Code, the Code's provisions governing a secured party's rights and duties in collateral were also applicable. 924 F.Supp. at 896–97. One of those provisions is § 409.207(2)(c):

(2) Unless otherwise agreed, when collateral is in the secured party's possession:

. . .

(c) The secured party may hold as additional security any increase or profits (except money) received from the collateral, but money so received, unless remitted to the debtor, shall be applied in reduction of the secured obligation. . . .

We pointed out that the statute neither imposes an outright obligation to put the collateral, in this case, the security deposit, in an interest-bearing account, nor compels mandatory interest payments. *Id.* at 897. Instead, § 409.207(2)(c) requires only interest *actually earned* ("received") from the collateral to be remitted to the lessee or applied to reduce his obligation. Id. None of the parties contests this interpretation of the statute.[15] Accordingly, we must determine whether Bank One did, in fact, earn interest from the deposit in a form contemplated by the UCC.[16]

### D. Bank One Did Not Earn Interest On the Security Deposits

Demitropoulos argues that Bank One did earn interest on the security deposit funds, and, as such, "received" from the collateral "money" that must be remitted to the

---

have been left intact by the decision. Werbosky merely confirms the different treatment of personal property leases under the UCC, a distinction apparent upon the UCC's enactment over three decades ago.

15. Bank One argues instead that this provision conflicts with Illinois, Consumer Deposit Security Act of 1987, 815 ILCS 165/3. As noted earlier, the Illinois Act permits a lessor requiring lessees to pay a security deposit in connection with a consumer General, and putting the deposits in bank accounts, which need not produce interest. *Id.* 165/3(a)-(b). If the deposit is $150 or more and the account bears interest, however, the lessor must pay this interest to the lessee. Id. 165/3(b). We need not decide whether the UCC § 9–207(c) conflicts, first, because Wisconsin law applies to the lease. Second, Bank One prevails even under what it contends are the more stringent provisions of the UCC, so it is unnecessary to determine whether the Illinois Act conflicts.

16. On January 7, 1997, one of our colleagues in the Northern District of Illinois, Judge Moran, issued an opinion in a case with facts very similar to those before us. *See Wiskup v. Liberty Buick Co.*, No. 95 C 4885, 1996 WL 18896 (N.D.Ill. Jan. 17, 1996). In addressing the plaintiff-lessee's claim for interest on a car lease security deposit under the Uniform Commercial Code, *Wiskup* held that the Illinois Consumer Deposit Security Act, not section 9–207(c) of the UCC, governed the defendant-lessor's security deposit obligations. Slip op. at 30. The court did not decide (because it did not have to) whether the deposit created a security interest under

the UCC. Judge Moran did, however, express the opinion that although he found the lessee's UCC argument "strong," it nevertheless encountered "several obstacles." *Id.* at 27. The cited obstacles are that: 1) Illinois courts are silent and few courts nationwide have ruled this way; -and 2) many pre-UCC cases characterize security deposits as debts, not pledges, and only pledges are specifically referenced in the UCC. *Id.* at 28.

We respectfully disagree that these observations are obstacles. First, the few cases nationwide finding that a security deposit creates a security interest all involve leases for personal property. In contrast, the cases cited in the opinion as holding that a deposit is a debt, not a pledge, are all real estate lease cases. Thus, the *Wiskup* decision seems to be unwittingly grouping the two lines of cases together. Yet, as explained above, real estate lease deposit cases are distinguishable from personal property lease cases because the former are expressly excluded from the Code by § 9–104(j). Moreover, the cases *Wiskup* cites were all strong authority on the Code's scope.

Ultimately, however, *Wiskup* does not bear on our decision because it is based on an interpretation of Illinois, not Wisconsin law. The result in that case is a function of the interaction between the Illinois Consumer Deposit Security Act and the Illinois UCC, an issue we expressly decline to address. And to the extent the case aids Bank One, it is moot because we grant the Bank summary judgment despite our holding that the UCC applies.

class members or used to reduce their obligations. Demitropoulos concedes that the Bank did not place the deposits in an interest-bearing account. He focuses instead on the fact that, according to Bank One's "Monthly Transaction Journal," the Bank had nearly $6 million in security deposit funds available for use at some point during the class period. Based on the affidavit of his expert, John Walsh, plaintiff maintains that this increase in operating funds alleviated the Bank's need to borrow from the Federal Reserve and enabled the Bank to collect interest by lending its excess funds to other banks. Demitropoulos speculates that any interest saved from not having to borrow or earned from lending may be "money" that Bank One "received" from the collateral and must pass on to the lessees. But Demitropoulos offers no real evidence in support of this supposition.

We find that § 409.207(2)(c) cannot sustain such a strained reading. Furthermore, even if it could, the record before us does not permit a rational trier of fact to conclude that Bank One saved or made money using the security deposit funds.

■■■ The court's primary job in construing a statute is to determine and advance the legislature's intent. *Ahlgren v. Pierce County*, 198 Wis.2d 576, 543 N.W.2d 812, 813 (1995). The best evidence of legislative intent is the language in the statute. *Town of DePere v. City of DePere*, 184 Wis.2d 278, 516 N.W.2d 1, 2 (Ct.App.1994). We are not, "under the guise of liberal construction," to read into the statute words that do not appear there, *Lang v. Lang*, 161 Wis.2d 210, 467 N.W.2d 772, 777–78 (1991), nor may we "look beyond the plain language of the statute to search for other meanings." *Ahlgren*, 543 N.W.2d at 813. Finally, a statute is not to be interpreted "in derogation of common sense." *State v. Clausen*, 105 Wis.2d 231, 313 N.W.2d 819, 826 (1982); *Town of DePere*, 516 N.W.2d at 2.

The question is whether having use of the security deposits to avoid borrowing or to increase lending on certain days constitutes "money ... received"[17] from collateral, which Bank One must calculate and divide among the lessees. We answer in the negative. First, if § 409.207(2)(c)'s drafters intended to cover such a specific situation in an area as heavily regulated as banking, they would have made that clear by using language far more precise than "money received from collateral." It is not our prerogative to read words into the statute. Second, Demitropoulos' interpretation defies common sense. If adopted, courts would have license to hold lessors who place security deposits in non-interest-bearing bank accounts liable to lessees for any hypothetical benefits the account might generate, such as an enhanced credit line from the bank. This Court will not, without legislative direction, place on lessors such an onerous burden to discern and calculate every possible benefit, no matter how small or tangential, gained from holding onto a security deposit. The UCC was enacted "to simplify, clarify and modernize the law governing commercial transactions," not complicate and muddle it. Wis. Stat. § 401.102(2)(a); *see also In re Nickerson & Nickerson, Inc.*, 329 F.Supp. 93, 96 (D.Neb.) ("[I]f there is one maxim by which transactions governed by the [UCC] should be construed it is surely that they be construed in the most commercially reasonable manner."), *aff'd*, 452 F.2d 56 (8th Cir.1971); *Farmers Cooperative Elevator Co. v. Union State Bank*, 409 N.W.2d 178, 181 (Iowa 1987) (Article 9 interpretations should be "sensible, workable, practical and logical").

■■■ This legal conclusion alone justifies summary judgment in the Bank's favor. But even if § 409.207(2)(c) could be read to encompass these "benefits," Demitropoulos has not shown that the Bank in fact received any. To defeat summary judgment, the nonmovant must point to "specific facts," by affidavit

---

17. We note that the meaning of "interest or profits" is not before us. The dispute here is over *money* that Bank One allegedly earned on the deposits, and the statute excludes the subset of money from "interest or profits" that the secured party may hold. See 2 Grant S. Gilmore, Security Interests In Personal Property § 42.8, at

1153–54 (1965) ("Money profits may not be held as additional security but must be either remitted to the debtor or applied in reduction of the obligation."). Indeed, Professor Gilmore writes that "[t]he only type of increase, other than money profits, which is likely to present itself is that of the young of animals." *Id.* at 1153.

or otherwise, establishing the presence of a genuine issue for trial. Fed.R.Civ.P. 56(e). Even expert affidavits must have this factual basis; naked opinions will not suffice. *Mid–State Fertilizer Co. v. Exchange Nat'l Bank,* 877 F.2d 1333, 1339 (7th Cir.1989) ("[A]ffidavits supporting and opposing motions for summary judgment must do more than present something that will be admissible in evidence. They shall 'set forth facts' and by implication in the case of experts (who are not 'fact witnesses') a process of reasoning beginning from a firm foundation."). Here, summary judgment must be granted because nothing in the plaintiff's evidence points to specific facts showing Bank One used the security deposits to defray its borrowing costs or to increase its lending.

The affidavit of plaintiff's expert, John Walsh, lacks the required "firm foundation"—indeed, it is pure conjecture. Based on Bank One's statement that the security deposits increased the Bank's operating funds, Walsh leaps to the conclusion that the deposits "would have been put to use to either lower the amount of the bank's borrowings or fund the bank's assets." He opines that, as a result, the bank would "likely" have decreased its interest expense or increased its interest income. But no specific facts show that the deposits materially benefitted Bank One in any manner. Walsh's testimony is not based on any admis-

sion by Bank One that it relied on the security deposits in some fashion, nor is it the product of personal knowledge about Bank One's operations. His guess as to what Bank One "would have done" in a given situation or how it "likely" benefitted is not good enough to withstand summary judgment because it is rank speculation. What a "major Chicago bank" does on a day-to-day basis with its security deposits is not probative in determining how, if at all, Bank One actually put these deposits to use during the class period. Finally, Walsh's conclusion that Bank One's failure to invest the security deposits "would not be maximizing shareholder earnings and would likely bring criticism from shareholders" is absurd, given that, under plaintiff's theory, any fruits of the investment would go directly to the lessees, not the Bank's shareholders.

Nor does the June 1996 "Monthly Transaction Journal" advance Demitropoulos' case. The journal simply sets forth, on a daily basis, the amount of security deposit funds held at Bank One. In June 1996, the journal reflects that Bank One received a total of about $6,000,000 in automobile lease security deposits. What the journal does not do is show that Bank One used these funds in any manner, much less permit a reasonable inference that Bank One used the deposits to avoid borrowing or increase lending.[18]

18. We wish briefly to address an unresolved discovery matter. In his Rule 12(N) statement, Demitropoulos dropped a footnote requesting this Court to grant a continuance under Fed. R.Civ.P. 56(f) for more discovery on the issue of where Bank One kept the security deposit. P1's Resp. ¶ 6 n. 1. According to Demitropoulos, Bank One had "not yet produced any documents demonstrating that the deposit was recorded as a 'general ledger entry.'" *Id.* ¶ 6. The morning before Demitropoulos' brief was due, however, Bank One produced exactly this type of document: a "Monthly Transaction Journal" tracking its car lease security deposits for the month of June 1996. The Court permitted Demitropoulos to file the journal as an "Additional Exhibit in Opposition to Defendant's Motion for Summary Judgment." In several paragraphs preceding the exhibit, Demitropoulos complains that Bank One's discovery responses remain incomplete because the Bank did not produce journals for every month of the class period. He states that, "[i]f necessary, plaintiff will move to compel these documents, and intends to conduct further discovery to ascertain the amount of interest

which Bank One actually earned on the deposits." Mot. File P1. Add'l Ex. ¶ 9. Based on these statements, it appears that the documents Demitropoulos seeks through additional Rule 56(f) discovery are the other Monthly Transaction Journals.

This Court will not permit further discovery in this area for several reasons. First, this Court casts a jaundiced eye upon motions made by footnote. The mandatory procedure for requesting additional discovery under Rule 56(f) is to submit an affidavit describing the materials sought and the reasons they cannot be obtained. *See Stone Container Corp. v. Hartford Steam Boiler Inspection Co.,* 936 F.Supp. 487, 504 n. 19 (N.D.Ill.1996); *Colan v. Prudential–Bache Securities Inc.,* 577 F.Supp. 1074, 1084 (N.D.Ill. 1983). Demitropoulos has filed no such affidavit, requiring the Court to guess at what specific documents he is seeking. Second, the time for discovery on this issue is long past. Despite plaintiff's stated intentions to file a motion to compel, none has been forthcoming, either before or during the pendency of this motion. In-

What we know, from the affidavit of Bank One's Vice President, who has first-hand knowledge about the Bank's operations, is that Bank One entered Demitropoulos' deposit amount as a debit on its general ledger. We know the Bank's operating funds fluctuated daily, and that the Bank did not rely on them every day to manage its cash position. But nothing in the record indicates when, if ever, the Bank relied on the security deposits.

Accordingly, we rule that Demitropoulos has failed to set forth specific facts, as required by Rule 56(e), entitling the class to interest on their security deposits. A plaintiff cannot avoid summary judgment merely by raising "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). Summary judgment on Count II, the restitution claim, is therefore granted.

### E. *Disposition of Remaining Claims*

Because Bank One did not earn interest on the security deposits, there was none to disclose. Consequently, Bank One did not violate the federal Consumer Leasing Act by failing to disclose earned interest. Nor did the Bank engage in an unfair or deceptive act under the Wisconsin Consumer Fraud Act by secretly retaining interest on the deposits. Summary judgment is thus granted on Count III (the Wisconsin Consumer Fraud Act claim), and on the portion of Count I's Consumer Leasing Act claim relating to interest on security deposits.

### CONCLUSION

For the foregoing reasons, Bank One's motion for summary judgment is hereby granted. We will enter judgment for the Bank on Counts II and III, and on Count I's disclosure-of-interest claim. The rest of Count I remains viable. The parties are ordered to attend a status hearing on February 11, 1997 at 9:15 a.m., at which time a firm litigation schedule, including a trial date, will be set to resolve the remaining issues in this lawsuit.

---

deed, the Court questions whether these documents have already been produced.

Most important, though, is the point that the discovery plaintiff seeks is unavailing. It is well-settled that "a plaintiff's entitlement to discovery prior to a ruling on a motion for summary judgment is not unlimited, and may be denied when the record demonstrates that the requested discovery is not likely to produce the facts necessary to defeat the motion." *Colan,* 577 F.Supp. at 1084; *see First Nat'l Bank of Arizona v. Cities Serv. Co.,* 391 U.S. 253, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968)(court may deny Rule 56(f) discovery when it would amount to a fishing expedition); *Paul Kadair, Inc. v. Sony Corp.,* 694 F.2d 1017, 1029–30 (5th Cir.1983) (court may deny Rule 56(f) request when additional discovery unlikely to produce necessary facts); *Contemporary Mission, Inc. v. United States Postal Serv.,* 648 F.2d 97, 107 (2d Cir.1981) (same). Demitropoulos wants to conduct more discovery "to as-

certain the amount of interest which Bank One actually earned on the security deposits," and, to that end, as far as we can tell, desires all Bank One's "Monthly Transaction Journals" during the class period. Mot. File Pl. Add'1 Ex. ¶ 9. But the journals give no indication that the deposits earned money. Even plaintiff's theory that the deposits benefitted the Bank by saving it from having to borrow is not in any way supported by the journals. They do not show how much, if any, of the security deposit funds were used to avoid borrowing. Compelling discovery here would truly be sanctioning a fishing expedition. Rule 56(f) may not be used to defeat a summary judgment motion "where the result of a continuance to obtain further information and discovery would be wholly speculative ..." 6 J. Moore, Moore's Federal Practice ¶ 56.24 (2d ed.1982), quoted in *Colan,* 577 F.Supp. at 1084. Demitropoulos' Rule 56(f) request for discovery is therefore denied.