**Joseph ROSENFELD and Quality Frozen Foods, Inc., on behalf of themselves and all others similarly situated, Plaintiffs,**

v.

**The PORT AUTHORITY OF NEW YORK AND NEW JERSEY, Metropolitan Transportation Authority, Triborough Bridge and Tunnel Authority, MTA Bridges and Tunnels, MTA Bridges and Tunnels E–ZPass Program, The New York State Thruway Authority, E–ZPass Regional Consortium, Interagency Group, Lewis M. Eisenberg, Charles A. Gargano, Kathleen A. Donovan, John J. Haley Jr., Robert C. Janiszewski, Peter S. Kalikow, Aubrey C. Lewis, David S. Mack, George D. O'Neill, Alan G. Philibosian, Melvin L. Schweitzer, Anastasia M. Song, Robert E. Boyle, Daniel T. Scannell, E. Virgil Conway, Alfred E. Werner, Barry L. Feinstein, Edward A. Vrooman, David S. Mack, James S. Simpson, Andrew M. Saul, Lawrence H. Silverman, Joseph Rutigliano, Beverly L. Dolinsky, Bernard B. Beal, John S. Dyson, Rudy Washington, Ronnie P. Ackman, Ernest J. Salerno, James L. Sedore Jr., Marc V. Shaw, Forrest R. Taylor, Michael C. Ascher, Stephen V. Reitano and John Does 1–30, Defendants.**

No. 98 CIV. 7757(ERK).

United States District Court,
E.D. New York.

July 31, 2000.

Joseph H. Weiss, Mark D. Smilow, Weiss & Yourman, New York, NY, for plaintiffs.

Ira J. Lipton, Senior Associate Counsel, Metropolitan Transportation Authority, New York, NY, for defendants Metropolitan Transportation Authority and Triborough Bridge and Tunnel Authority.

Elliot Spitzer, Attorney General of the State of New York, New York, NY (August L. Fietkau, Assistant Attorney General, of counsel), for defendant New York State Thruway Authority.

Milton H. Pachter, Port Authority of New York and New Jersey, New York, NY (Jay A. Selcov, of counsel), for defendant Port Authority of New York and New Jersey.

William Wolfe, Bathgate, Wegener & Wolfe, P.C., Lakewood, NJ, for defendant New Jersey Turnpike Authority.

### MEMORANDUM & ORDER

KORMAN, Chief Judge.

The issue presented by this case is whether the Constitution of the United States requires that interest earned on funds deposited by customers in the highway, bridge and tunnel toll collection system known as E–ZPass be paid to E–

ZPass customers. The E–ZPass system was developed for use by several toll authorities in the northeast region of the United States in order to ease traffic backups at highway, bridge and tunnel toll plazas and to reduce air pollution resulting from the traffic congestion associated with those backups. Ascher Aff. ¶¶ 11–12. The E–ZPass technology permits a driver to pay a toll without having to stop the vehicle and without having to engage in the physical exchange of money, tokens or tickets with a human or automated toll collector. *Id.* ¶ 11. The system requires that each vehicle be equipped with a small electronic tag (installed on the vehicle's windshield) that communicates information to an electronic reader installed in each E–ZPass toll lane. *Id.* ¶¶ 8, 23. The reader collects the information from the vehicle's tag and transmits that information to a data center where the appropriate toll is electronically deducted from the vehicle owner's prepaid account. *Id.* ¶ 8.

In order to enroll in E–ZPass, a customer is required to fill out an application form, which requests personal, commercial (if applicable) and vehicle identification information for billing purposes. *Id.* ¶¶ 20–21 & Exs. 1–2; Kristlibas Aff. ¶ 2 & Exs. A–B; O'Connor Reply Cert. Ex. A. Also on the application form, customers must elect to fund their accounts (*i.e.*, pay for their tolls in advance) either with cash or by credit card. Ascher Aff. ¶ 22. In addition, cash customers are required to pay a refundable security deposit for the tags, but credit card and commercial customers are not. Ascher Aff. ¶ 23; Rinaldi Aff. ¶¶ 10, 19; Ascher Reply Aff. ¶ 6. The vast majority of E–ZPass customers fund their accounts by credit card. Ascher Aff. ¶ 22.

Replenishment of cash balance accounts depends on the method of payment selected. For a cash customer, when the account dips below a threshold amount, the customer will see a warning light at the toll lane (*e.g.*, a message stating "low balance/account low"), which notifies the customer of the need to replenish his or her account to a level at or above a fixed minimum. *Id.* Ex. 1. For a credit card customer, the E–ZPass system offers an automatic replenishment option, under which the card is charged a replenishment amount once the account balance falls below the threshold amount. *Id.* ¶ 26.

Along with the application form, each customer must submit a signed customer agreement. *Id.* ¶ 21; Rinaldi Aff. ¶ 13; Kristlibas Aff. ¶¶ 2–3. Significantly, the customer agreement expressly provides that interest accruing on the E–ZPass account balance (and, for cash customers, on the refundable tag deposit) will *not* be paid to the customer. Ascher Aff. ¶ 28 & Exs. 1–2; Rinaldi Aff. ¶ 14 & Ex. A; Kristlibas Aff. ¶ 4 & Ex. B; O'Connor Reply Cert. Ex. A. Customers do, however, receive discounts on their tolls solely for participating in E–ZPass, the monetary amounts of which vary depending on a customer's commercial or non-commercial status, the particular entity defendant through which a customer has enrolled in E–ZPass, and the particular E–ZPass plan selected by the customer. Ascher Aff. ¶¶ 19, 37 & Ex. 1; Rinaldi Aff. ¶ 9; Kristlibas Aff. ¶ 2. Moreover, enrollment in E–ZPass is voluntary, and customers remain free to pay their tolls in contemporaneous cash transactions at the designated cash toll lanes. Rinaldi Aff. ¶¶ 5, 11–12; Ascher Reply Aff. ¶ 5. Indeed, as a result of the widespread use of E–ZPass and the dramatic shift of customers from cash lanes to E–ZPass lanes, backups and congestion at the traditional cash lanes have decreased from the levels that existed before the implementation of the E–ZPass system. Ascher Aff. ¶ 18; Ascher Reply Aff. ¶ 15.

Plaintiffs are an individual and a corporation seeking to represent a class consisting of all commercial and non-commercial customers with funds deposited in E–ZPass cash balance accounts. Pursuant to the above-described waiver in the E–ZPass customer agreement, interest earned on the funds in E–ZPass accounts is retained by the entity defendants, and is

not distributed to the plaintiff customers. Plaintiffs complain that this practice violates the Takings Clause of the Fifth Amendment of the United States Constitution, and seek (i) to enjoin defendants from continuing to retain the interest earned on customer E–ZPass accounts and (ii) damages under 42 U.S.C. § 1983 for the interest retained by defendants to date. I agree with defendants that the claim is without merit and grant their motion for summary judgment.

### Discussion

The threshold question presented is whether the interest accruing on customer funds on deposit with E–ZPass, and, according to a cross-motion by plaintiffs to amend, whether the principal amounts themselves, are "private property" for purposes of the Takings Clause of the Fifth Amendment. Under the Takings Clause, "private property" shall not "be taken for public use, without just compensation." U.S. Const. amend. V (made applicable to the states through the Fourteenth Amendment, *see Chicago, B. & Q.R. Co. v. Chicago,* 166 U.S. 226, 239, 17 S.Ct. 581, 585–86, 41 L.Ed. 979 (1897)). "Because the Constitution protects rather than creates property interests, the existence of a property interest [for purposes of the Takings Clause] is determined by reference to 'existing rules or understandings that stem from an independent source such as state law.'" *Phillips v. Washington Legal Foundation,* 524 U.S. 156, 164, 118 S.Ct. 1925, 1930, 141 L.Ed.2d 174 (1998) (quoting *Board of Regents of State Colleges v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972)).

Defendants argue that plaintiffs cannot establish, under applicable state law, the existence of a property interest in the E–ZPass account interest. As a consequence, defendants argue, there is no constitutionally protected "private property" here that defendants can be considered to have "taken." In support of this argument, defendants point to the existence of consideration for any foregone interest in the forms of (i) the toll discounts customers receive solely for using E–ZPass and (ii) the convenience E–ZPass affords in comparison to traditional cash toll lanes. Thus, defendants state, the E–ZPass customer agreement is nothing more than a routine contract between a provider of services and its customers. Defendants analogize the E–ZPass arrangement to other voluntary commercial arrangements in which funds are advanced prior to the provision of goods and services, but in which, based on "common experience in our daily commercial life," the purchaser is not entitled to any interest:

> Thus, a gift certificate from a department store does not entitle the holder to interest accrued on the amount of the certificate, even though the store might have had use of the money prior to the redemption of the certificate. Similarly, an airline may sell a ticket well in advance, but will not owe the passenger the interest earned on the price of the ticket prior to its use....

> The same understanding applies as well to organizations providing public transportation. Thus, commuter rail customers buy their monthly commutation passes in advance. Before the beginning of the month, the railroads receive payment for rides that will not be used until the end of that month. Similarly, the New York City subway and bus system's MetroCard [sic] customers buy their rides in advance when they purchase computerized cards with value electronically encoded thereon. Like the E–ZPass, the subway or bus fare for MetroCard users remains on account and is deducted from the card's outstanding balance whenever the customer uses it. Even where bridge and tunnel service is concerned, well before the implementation of E–ZPass, [defendants] offered motorists the option of paying for the service in advance .... [by] buying rolls of tokens in advance as a means of speeding passage through the toll

lanes. In this regard, E–ZPass is nothing more than an electronic, "high tech" roll of tokens.

Defs.' Mem. at 7–8.

■ Defendants' common-sense reasoning is fully supported by the case law. Under New York law, which expressly governs the customer agreements used by most of the entity defendants, unless the parties to a contract expressly agree otherwise, a party that pays money in advance of receiving the goods or services contracted for is *not* entitled to receive the interest that accrues on the funds advanced. *See New York State Thruway Authority v. Hurd*, 25 N.Y.2d 150, 158, 303 N.Y.S.2d 51, 56, 250 N.E.2d 335 (1969) (where money has been paid in advance for performance under a contract, "the obligation to pay interest ... must be expressed or implied-in fact, or else it does not exist"). New Jersey law, which expressly governs the customer agreements used by certain New Jersey and Delaware agencies who are members of defendant E–ZPass Regional Consortium, *see* O'Connor Reply Cert. ¶ 3 & Ex. A ¶ 12, is substantially the same. *See Silverstein v. Shadow Lawn Sav. & Loan Ass'n*, 51 N.J. 30, 43, 237 A.2d 474 (1968) ("interest as compensation for the use, detention or forbearance of money is a matter of contract"); *Consolidated Police and Firemen's Pension Fund Comm'n v. City of Passaic*, 23 N.J. 645, 651–52, 130 A.2d 377 (1957) ("It is fundamental in our law that 'interest is no part of a debt unless so stipulated in the contract'.... [T]he law neither imposes nor implies an obligation to pay interest from the moment of the creation ... of a deposit.... That obligation must arise from special agreement of the parties" (citations omitted)). Applied here, the parties have not expressly contracted for the payment of accrued interest from E–ZPass customer accounts. In fact, they have done quite the opposite, as each customer agreement expressly provides that interest accruing on the customer's E–ZPass account balance (and, for cash customers, on the refundable tag deposit) will *not* be paid to the customer. Ascher Aff. ¶ 28 & Exs. 1–2; Rinaldi Aff. ¶ 14 & Ex. A; Kristlibas Aff. ¶ 4 & Ex. B; O'Connor Reply Cert. Ex. A.

■ Plaintiffs concede the applicability of the above common law rule that no interest is due absent express agreement to the contrary. Pls.' Mem. at 12. They argue, nonetheless, that the common law rule is superseded in this case by New York General Obligations Law § 7–101 ("§ 7–101"), which provides as follows:

1. Whenever money shall be deposited or advanced on a contract for the use or rental of personal property as security for performance of the contract or to be applied to payments upon such contract when due, such money, with interest accruing thereon, if any, until repaid or so applied, shall continue to be the money of the person making such deposit or advance and shall be a trust fund in the possession of the person with whom such deposit or advance shall be made and shall be deposited in a bank or trust company and shall not be mingled with other funds or become an asset of such trustee....

2. Any provision of a contract whereby a person who has deposited or advanced money on a contract for the use or rental of personal property as security for the performance of the contract waives any provision of this section is absolutely void.

Applying this statute, plaintiffs argue that, under subsection [1], the E–ZPass customer agreement is a contract "for the use or rental of personal property"— namely, the electronic tag—and that the funds customers advance into their E–ZPass cash balance accounts (either as refundable tag deposits or for the prepayment of tolls) are advanced "as security for the performance of the contract or to be applied to payments upon such contract when due." Because "such money, with interest accruing thereon, ... shall continue to be the money of the [purchaser] and

shall be a trust fund in the possession of the [seller]," plaintiffs argue that § 7–101[1] takes the E–ZPass customer agreement outside the purview of the above-discussed common law rule precluding interest, and creates a property interest under state law that is cognizable for purposes of the Takings Clause. Moreover, plaintiffs argue, because subsection [2] renders void any waiver of the right to interest under subsection [1], the express provision of the E–ZPass customer agreement stating that accrued interest will not be paid to customers is not an enforceable waiver of the property interest allegedly created by the statute. Plaintiffs also rely on the statute's requirement that the funds advanced "shall not be mingled with other funds" as support for their cross-motion to amend the complaint to allege improper commingling of the principal amounts of the funds with defendants' operating or other accounts. Plaintiffs point to materials submitted by defendants in support of their motion to dismiss as evidence of such improper commingling, and plaintiffs submit a Rule 56(f) affidavit detailing further discovery that they claim is needed to flesh out, *inter alia*, the extent of such commingling.

Plaintiffs' reliance on § 7–101 to establish a property interest is fundamentally flawed. By its plain language, § 7–101 does not apply to service contracts, but rather, only to contracts "for the use or rental of personal property." While no cases expressly interpreting this particular requirement under § 7–101 have been decided, the Second Circuit has noted in dictum that the statute applies only where the contract's "foremost concern" is with the use or rental of personal property, and that "a contract in which the supply of services [i]s a substantial element might very well not come within the coverage of § 7–101." *In the Matter of United Network, Inc.*, 459 F.2d 556, 561 (2d Cir.1972) (finding that § 7–101 applied because "the contract's foremost concern was with the use of television equipment ... and the bulk of the ... payments was for the

purpose of obtaining such use," and because "the services provided for in this agreement were merely incidental to its equipment rental aspects").

Unlike *United Network*, the E–ZPass customer agreement clearly is a service contract. While the electronic tags (upon which plaintiffs hinge their claim as to the applicability of § 7–101) certainly may be considered to be "personal property," their existence does not suffice to alter the basic nature of the agreement as one whose "foremost concern," or, at the very least, a "substantial element" of which, is the provision of a transportation service. The specific transportation service provided under the E–ZPass customer agreement is the facilitation of customers' passage through defendants' highways, bridges and tunnels without the need to stop and pay cash at defendants' toll plazas. As customers are advised in defendants' brochure, E–ZPass is an "electronic toll collection system" that makes motor vehicle travel "faster than ever before." Ascher Aff. Ex. 1; Ascher Reply Aff. Ex. 2. As defendants note, plaintiffs' attempt to recast the customer agreement into one for the use or rental of the tag is

analogous to an assertion that, by purchasing a monthly commutation pass, railroad commuters actually purchase a piece of laminated paper or plastic, *i.e.*, the pass, rather than the right to travel on the railroad for the month during which the pass is effective. Similarly, plaintiffs might also argue that by obtaining a Metrocard [sic] with the value of fares purchased in advance and encoded thereon, New York City subway and bus users have merely bought a piece of personal property (*i.e.*, the plastic card). The card, of course, is merely the device by which the customer pays for what is truly being purchased—subway and bus transportation service.

.... Like the railroad commuter pass, MetroCard, or an airplane boarding pass, the tag is merely the device by

which defendants' facilities may be entered and the fare paid. As customers are advised in the brochure, the tag "is the key to making the E–ZPass electronic toll payment system work." But the [a]greement is one for the pre-payment of tolls—not for the use or rental of the tag itself. Again, the tag is merely a device by which customers may partake in an electronic toll collection system, which facilitates motorists' ability to actually use the ultimate service being provided—thruways, bridges and tunnels. Defs.' Reply Mem. at 4–5.

■ Plaintiffs rely, in the alternative, on Article 9 of the Uniform Commercial Code ("UCC"), as enacted in New York and New Jersey, in asserting that state law affords them a property interest in the interest accruing on their E–ZPass cash balance accounts. Article 9 of the UCC applies to "any transaction (regardless of its form) which is intended to create a security interest in personal property," as well as "to security interests created by contract including pledge." New York Uniform Commercial Code ("NYUCC") § 9–102[1][a]–[2]; N.J.S.A. 12A:9–102[1][a]–[2]. A "security interest" is defined as "an interest in personal property ... which secures payment or performance of an obligation." NYUCC § 1–201[37]; N.J.S.A. 12A:1–201[37]. Under the specific provision upon which plaintiffs rely, "[u]nless otherwise agreed [ (emphasis added) ], when collateral is in the secured party's possession ... the secured party may hold as additional security any increase or profits (except money) received from the collateral, but money so received, unless remitted to the debtor, shall be applied in reduction of the secured obligation." NYUCC § 9–207[2][c]; N.J.S.A. 12A:9–207[2][c]. Applying this section, plaintiffs argue that the funds that customers (whom plaintiffs characterize as the "debtors" under the UCC) advance into their E–ZPass cash balance accounts are the "collateral" contemplated by the UCC,

and that the "secured obligation" under the UCC is the customers' obligation to pay defendants (whom plaintiffs characterize as the "secured parties" under the UCC) for usage of the tags as such payments become due (which, according to plaintiffs, occurs as customers use the tags to pass through toll lanes).

Plaintiffs' reliance on UCC § 9–207[2][c] also is unavailing. As an initial matter, the E–ZPass customer agreement does not create a "security interest" within the meaning of the UCC because what plaintiffs claim is a "secured obligation" to pay defendants as the tags are used is not even an "obligation." That is, even if plaintiffs' characterization were correct that the E–ZPass arrangement is primarily one for the use of the tags rather than for the receipt of a transportation service (which, as discussed above under *United Network*, it is not), the very nature of the advance deposits that plaintiffs characterize as "collateral" is a *prepayment*. Thus, there is no remaining "obligation" due and owing to defendants as the tags are used (or, more appropriately characterized, as customers avail themselves of the transportation service provided under the E–ZPass arrangement). Indeed, if there exists any "obligation" flowing from one side to the other following the advancement of funds by customers, it is *defendants'* obligation to provide the transportation service for which customers have prepaid.

■ Even assuming that the E–ZPass customer agreement could be considered a "secured transaction" of a type contemplated by UCC § 9–207[2][c], the express waiver of interest under the E–ZPass customer agreement effectively removes the agreement from the purview of the statute, which only applies "[u]nless otherwise agreed." *See, e.g., Steinmetz v. Toyota Motor Credit Corp.*, 963 F.Supp. 1294, 1304 (E.D.N.Y.1997) (automobile credit corporation not required, under UCC § 9–207[2][c], to pay lessee profits from investment of security deposits because, even assuming UCC § 9–207[2][c] applied, that

section expressly permits parties to waive any right to such profits, and lease's explicit statement that no interest would accrue or be paid to lessee on security deposit constituted such a waiver); *Bissell v. Merrill Lynch & Co., Inc.,* 937 F.Supp. 237, 248–49 (S.D.N.Y.1996) (securities broker not required, under UCC § 9–207[2][c], to pay customer interest received on collateral deposited by customer to secure customer's short sales in securities borrowed from broker because, even assuming UCC § 9–207[2][c] applied, that statute by its terms comes into effect only "[u]nless otherwise agreed," and parties' agreement authorized broker only to pledge deposited assets, negating any intention of parties that interest earned by collateral was to be paid to customer by broker), *aff'd,* 157 F.3d 138 (2d Cir.1998).

Plaintiffs seek, nevertheless, to split a hair by arguing that, again assuming UCC § 9–207[2][c] applies, the interest waiver in the E–ZPass customer agreement only expressly waives customers' alleged right to the *payment* of interest accruing on cash balance accounts, but does not expressly waive customers' alleged right to have the interest "applied in reduction of the secured obligation" under UCC § 9–207[c][2]. Thus, plaintiffs argue, the parties have not "otherwise agreed" to waive the customers' alleged right to the "application of the interest amounts to reduce the balance owing for toll usage." Pls.' Supp. Opp. Mem. at 9. A similar argument to this one, however, was raised and rejected in *Steinmetz.*

In *Steinmetz,* plaintiff argued "that although section 9–207 expressly permits parties to waive any right to *profits* accruing on the lessor's investment of security deposits, the Lease at issue in this case only purports to waive accrued 'interest,' not all forms of profit. As a result, the plaintiff contends that under the U.C.C. he would be entitled to any such non-interest benefits," including profits. *Steinmetz,* 963 F.Supp. at 1304 (emphasis added). Judge Spatt, nevertheless, found plaintiff's

argument to be a "counterintuitive" interpretation of both the subject lease and UCC § 9–207, and held that the right to profits on security deposits under the statute, while not expressly waived in the lease, were nonetheless waived pursuant to the lease's express waiver of interest. *Id.* In finding the argument counterintuitive to the subject lease, Judge Spatt reasoned that, where a contract provides for the payment of a security deposit and the depositor agrees to expect no interest payment, that party "would [not] subsequently assume that he was entitled to some other type of accrued benefit" on the pledged funds. *Id.* In finding the argument counterintuitive to UCC § 9–207, Judge Spatt reasoned that the legislative intent in enacting the UCC was not to force parties to a security agreement, in drafting such a waiver, to list every possible manner in which money earned on the security deposit could be returned or applied for the benefit of the depositor. *Id.* at 1304–05. In reaching this conclusion, Judge Spatt relied on an earlier interpretation of § 9–207 under Wisconsin's version of the UCC:

> This Court will not, without legislative direction, place on lessors such an onerous burden to discern and calculate every possible benefit, no matter how small or tangential, gained from holding onto a security deposit. The UCC was enacted "to simplify, clarify and modernize the law governing commercial transactions," not complicate and muddle it.

*Demitropoulos v. Bank One Milwaukee, N.A.,* 953 F.Supp. 974, 985 (N.D.Ill.1997) (quoting UCC § 1–102[2][a] ). The interest waiver in this case is similarly worded to the one in *Steinmetz,* and can only reasonably be read as a waiver of all possible benefits deriving from the interest accruing on the funds advanced into customers' E–ZPass cash balance accounts.

Plaintiffs argue, nonetheless, that the waiver itself, regardless of its scope, is unenforceable because it is "the product of a contract of adhesion," and, therefore, is "unconscionable." Pls.' Mem. at 21. Spe-

cifically, plaintiffs complain that the waiver itself is "unreasonably favorable to defendants" and that the E–ZPass customer agreement as a whole is a "universal, standard form, non-negotiable, fine print contract that cannot be changed by class members. No choice or negotiation about [its] terms [ ] are available to participants[, and it] is issued only as a take it or leave it proposition. In fact, class members are without choice without a competing technology." *Id.*

The Court of Appeals of New York has defined an "unconscionable" contract as "one which 'is so grossly unreasonable or unconscionable in the light of the mores and business practices of the time and place as to be unenforcible [sic] according to its literal terms.'" *Gillman v. Chase Manhattan Bank, N.A.,* 73 N.Y.2d 1, 10, 537 N.Y.S.2d 787, 791, 534 N.E.2d 824 (1988) (citation omitted). "A determination of unconscionability generally requires a showing that the contract was *both* procedurally and substantively unconscionable when made—*i.e.,* 'some showing of an absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party.'" *Id.* (emphasis added, citation and internal quotation marks omitted). The procedural component

> requires an examination of the contract formation process and the alleged lack of meaningful choice. The focus is on such matters as the size and commercial setting of the transaction, whether deceptive or high-pressured tactics were employed, the use of fine print in the contract, the experience and education of the party claiming unconscionability, and whether there was disparity in bargaining power.

*Id.,* 73 N.Y.2d at 10–11, 537 N.Y.S.2d at 791, 534 N.E.2d 824 (internal citation omitted). This is the same analysis to be applied in determining whether a form contract is unenforceable as a contract of adhesion. *Sablosky v. Edward S. Gordon Co., Inc.,* 73 N.Y.2d 133, 139, 538 N.Y.S.2d

513, 517, 535 N.E.2d 643 (1989). The substantive component "entails an analysis of the substance of the bargain to determine whether the terms were unreasonably favorable to the party against whom unconscionability is urged." *Gillman,* 73 N.Y.2d at 12, 537 N.Y.S.2d at 792, 534 N.E.2d 824.

Turning first to the procedural component, the E–ZPass customer agreement cannot be considered procedurally unconscionable, or a contract of adhesion, simply because it is a form contract. One of the factors to be considered—"the size and commercial setting of the transaction"—is particularly important in this regard. Customers of E–ZPass number in the millions, Ascher Aff. ¶ 16, and it would be commercially impracticable for defendants to negotiate individual terms with each customer prior to the execution of each customer agreement. Form contracts have never been held to be *per se* unenforceable, and the commercial setting underlying the E–ZPass customer agreement appears peculiarly suited to the use of a form contract. The other factors articulated by the Court of Appeals under the procedural component also support a finding that the agreement, particularly the waiver provision, is not procedurally unconscionable. For example, although plaintiffs appear to argue that the waiver provision is "deceptive" because "it was seemingly inserted into the [customer agreement] as a cloak to conceal from class members an unlawful misappropriation of class members' private property," Pls.' Sur–Opp. Mem. at 9, this argument is circular—*i.e.,* plaintiffs seek to establish a property interest under the Takings Clause by arguing that the waiver provision is unenforceable, but at the same time claim that the waiver provision is unenforceable because it "conceal[s]" the existence of a Takings Clause violation. Plaintiffs do not, however, point to anything deceptive about the waiver provision itself. Nor do plaintiffs contend that the waiver is buried in "fine print," or that their own "experience and education" affected their

ability to comprehend the waiver at the time they agreed to execute the customer agreement.

Moreover, plaintiffs cannot credibly contend that defendants have used any "high-pressured tactics" in connection with the execution of the customer agreement. Although plaintiffs argue that they are "without choice without a competing technology," they are, nonetheless, offered the option of participating in several E–ZPass plans under the customer agreement, each of which, while subject to the interest waiver, offers some form of toll discount. Plaintiffs also cannot be considered to be "without choice without a competing technology," because they remain free to continue to use traditional cash toll lanes, which, as discussed, have had shorter lines since the institution of E–ZPass. The mere fact that participation in E–ZPass is contractually conditioned upon the waiver of interest is not, in and of itself, a "high-pressured tactic[ ]," particularly in light of the commercial setting of the transaction. Lastly as to procedural unconscionability, although it is true that there is a "disparity in bargaining power" here, such is the case with the vast majority of form contracts, including those that are enforceable. Nevertheless, in *State of New York v. Avco,* 50 N.Y.2d 383, 389, 429 N.Y.S.2d 181, 185, 406 N.E.2d 1075 (1980), the Court of Appeals "took pains to note . . . that the purpose of th[e unconscionability] doctrine is not to redress the inequality between the parties but simply to ensure that the more powerful party cannot 'surprise' the other party with some overly oppressive term." *Brower v. Gateway,* 246 A.D.2d 246, 253, 676 N.Y.S.2d 569, 573 (1st Dep't 1998) (quoting *Avco* ). Plaintiffs make no allegation of "surprise" here. The E–ZPass customer agreement is not procedurally unconscionable.

Turning to the substantive component, "[w]hile determinations of unconscionability are ordinarily based on the court's conclusion that both the procedural and substantive components are present, there have been exceptional cases where a provision of the contract is so outrageous as to warrant holding it unenforceable on the ground of substantive unconscionability alone." *Gillman,* 73 N.Y.2d at 12, 537 N.Y.S.2d at 792, 534 N.E.2d 824 (internal citation omitted). Nevertheless, the interest waiver, while it concededly favors defendants, does not fall within this "exceptional" category because it cannot be considered " 'so grossly unreasonable or unconscionable in the light of the mores and business practices of the time and place as to be unenforcible [sic] according to its literal terms.' " *Id.,* 73 N.Y.2d at 10, 537 N.Y.S.2d at 791, 534 N.E.2d 824 (citation omitted). This is particularly so in light of the commercial setting of the transaction, the toll discounts customers receive solely for participating in E–ZPass and the option to continue to use traditional cash toll lanes instead of E–ZPass.

The foregoing discussion demonstrates that plaintiffs' Takings Clause claim fails on its threshold issue because plaintiffs cannot establish a property interest by reference to state common or statutory contract law. Nevertheless, even if plaintiffs were correct in arguing that such an interest exists, it would not have amounted to the type of property interest warranting constitutional protection under the Takings Clause. In *Phillips, supra,* the Supreme Court applied, for Takings Clause purposes, the same standard for the establishment of a constitutionally protected property interest that it applied in the context of a procedural due process claim in *Roth, supra*—*i.e.,* that the property interest must "stem from an independent source such as state law." In a thoughtful opinion by Judge Newman addressing the issue of whether a breach of contract amounted to the deprivation of a property interest for procedural due process purposes, the Second Circuit observed as follows:

In one sense, of course, every enforceable contract right can be said to be an

"entitlement." As long as a state provides judicial remedies for the enforcement of contracts, either specific performance or damages for breach, every person holds a legitimate expectation that his contractually conferred rights are secure. And whenever a person contracts with a state, breach by the state can be considered a denial of his entitlement to performance of the contract. If the concept of "entitlement" were this expansive, federal courts could be asked to determine the procedural fairness of every action by a state alleged to be in breach of its contracts. Yet, as the Seventh Circuit has observed, "We must bear in mind that the Fourteenth Amendment was not intended to shift the whole of the public law of the states into the federal courts." *Brown v. Brienen*, 722 F.2d 360, 364 (7th Cir.1983).... [T]he doctrinal implications of constitutionalizing all public contract rights would raise substantial concerns, and we seriously doubt that *Roth* and its progeny portend such a result, although we do not reach the issue today.

*S & D Maintenance Co., Inc. v. Goldin*, 844 F.2d 962, 966 (2d Cir.1988); *see also Costello v. Town of Fairfield*, 811 F.2d 782, 784 (2d Cir.1987) (declining to recognize a constitutionally protected property interest in a claim for an alleged contractual increase in municipal retirement benefits; noting that the claim turned on the interpretation of the retirement benefits contract, the Second Circuit observed, "[a] contract dispute ... does not give rise to a cause of action under section 1983").

Judge Newman went on to explain that instances in which contractual rights have been protected as property interests are limited, but occur, for example, "in connection with a state's revocation of a status, an estate within the public sphere characterized by a quality of either extreme dependence in the case of welfare benefits, or permanence in the case of tenure, or sometimes both, as frequently occurs in the

case of social security benefits." *S & D Maintenance*, 844 F.2d at 966. Plaintiffs' alleged property interest in the interest accruing on their E–ZPass cash balance accounts does not rise to any such level, as it is merely the product of their voluntary contractual relationship with defendants. *See Diederich v. County of Rockland*, 999 F.Supp. 568, 573 (S.D.N.Y.1998) (granting defendants summary judgment on Takings Clause claim because, *inter alia*, "[o]ur circuit ... has hesitated to extend property protection to contractual rights," and plaintiff's "interests in his time accruals ... do not rise to [the] levels" of the constitutionally protected property interests identified by the Second Circuit in *S & D Maintenance* ); *see also Economic Opportunity Commission of Nassau County, Inc. v. County of Nassau, Inc.*, 47 F.Supp.2d 353, 368–69 (E.D.N.Y.1999) (applying *S & D Maintenance* in same manner to dismiss Takings Clause claim on summary judgment, noting that "this Circuit has not extended property protection to contractual rights"). Plaintiffs' remedies, if any (and there appear to be none), would not lie under the Constitution, but rather, under the law of contracts pursuant to state common law or the state statutes upon which they have relied here.

### Conclusion

Defendants' motion for summary judgment is granted. Plaintiffs' cross-motion for leave to amend is denied.

SO ORDERED.